## APPEAL OF STANDARD MARINE INSURANCE COMPANY, LTD.

Docket No. 4822.    Decided September 18, 1926.

1. The interest on Anglo-French Loan bonds and British Government bonds, owned by a foreign corporation, but held within the United States, is not income from sources within the United States within the meaning of the Revenue Act of 1918.

2. A foreign insurance company doing business within the United States is entitled to deduct, in computing its net income from sources within the United States, the cost of the reinsurance of risks written within the United States, whether such reinsurance is effected within or without the United States.

3. An amount in the nature of a reserve, set up by the taxpayer on its books, at the end of the taxable year, to cover liability accrued but undetermined in amount, arising under contracts to refund to policyholders portions of premiums paid by them, *held*, not to be a proper deduction in computing net income for that year.

*Randolph E. Paul*, Esq., and *Charles B. McInnis*, Esq., for the petitioner.
*A. H. Fast*, Esq., for the Commissioner.
*William H. Hotchkiss*, Esq., as *amicus curiae*.

This appeal is from the determination of deficiencies in income and profits taxes for the years 1917 and 1918 in the amounts of $93,532.14 and $36,262.79, respectively.

### FINDINGS OF FACT.

(1) The taxpayer is a corporation organized under the laws of Great Britain, and is engaged in the business of marine insurance in Great Britain, the United States, and other countries. Its business in the United States is transacted through branch offices located at 60 Beaver Street, New York, N. Y.

(2) During the years 1917 and 1918, the Insurance Department of the State of New York prohibited the taxpayer's United States branch from remitting funds to its home office at Liverpool, England, except for reimbursing the home office for losses paid on risks assumed by the United States branch, and for interest collected by the United States branch on investments held within the United States. As a result of the requirements of the Insurance Department of the State of New York, the United States branch of the taxpayer kept in the United States funds which it would otherwise have remitted to the home office in Liverpool, part of which funds were invested in United Kingdom of Great Britain and Ireland 5½ per cent convertible collateral notes, and Anglo-French five-year 5 per cent External Loan bonds. The United States branch of the taxpayer received as interest on these bonds, $14,373.25 in the year 1917 and $23,750 in the year 1918, all of which was remitted to the home office at Liverpool.

(3) The system used by the taxpayer in the conduct of its business is the one under which nearly all of the exports and imports of the United States are insured under marine insurance. It is as follows:

The shipper of merchandise takes out an insurance policy, usually with one company, covering all imports or exports, wherever and however made. These policies are known as "open contracts" and under them insurance automatically attaches to all shipments made by the insured, during the life of the policy, from the time they leave the warehouse of the insured until they arrive at the warehouse of the consignee. In many cases the policyholder does not know until after the vessel has sailed exactly how much cargo belonging to him is loaded on such vessel, because, having shipped his merchandise from the interior under through bills of lading, particulars as to the name of the vessel, etc., can only be furnished after the cargo is loaded and often only after a vessel has sailed. This being so, the insurance company may find that a number of its policyholders have shipments on the same vessel, and it can not

ascertain the extent of its liability until after the vessel is at sea and in some cases until after the property has actually been destroyed. The same conditions apply to insurance on imports from foreign countries.

It is and has been the custom of the taxpayer and other marine insurance companies, in order to avoid too great a liability under their policies, to protect themselves by reinsurance. The reinsurance resorted to by the taxpayer during the years 1917 and 1918, was as follows:

(a) Share reinsurance, whereby the reinsurer agrees to cover a fixed proportion of taxpayer's risk on each policy; as each declaration of risk is made to the taxpayer by the assured the reinsurer automatically takes the agreed share of it.

(b) Excess of line reinsurance, whereby the reinsurer agrees to take a certain proportion of any risks in excess of what the taxpayer . wishes to retain. Under this method the reinsurer has no liability until the taxpayer has filled its own net retained lines.

(c) Cotton shore fire reinsurance, whereby the reinsurer agrees to cover a portion of the taxpayer's cotton shore fire risks. This class of reinsurance applies only to loss of cotton by fire before being loaded on the vessel; and

(d) Specific reinsurance (rarely resorted to by this taxpayer), whereby the taxpayer reinsures a portion of its risk on a particular vessel after having found that the vessel was a poor risk or that the taxpayer had an aggregation of risks on the vessel in excess of what its automatic reinsurance contracts would cover.

In the event that property covered by insurance is lost or destroyed, the company that assumed the original risk pays the amount of the loss to the insured, and looks to the reinsurer for the amount for which the reinsurer has assumed liability under the contract of reinsurance.

During the year 1918, the taxpayer reinsured a portion of the risks written by its United States branch. A part of this reinsurance was placed by the United States branch with other marine insurance companies in the United States and the remainder was placed with foreign companies in England by the home office of the taxpayer. On the books of the home office the United States branch was charged with the cost of reinsurance and credited with the amount recovered from the reinsurer. The reinsurance entries were transmitted to the United States branch and entered on its ledger accounts.

The larger part of the reinsurance effected by both the home office and the United States branch on the risks assumed by the United States branch was on blanket reinsurance contracts with other marine insurance companies made prior to the assumption of the

risk by the United States branch, whereby a certain proportion of the entire business or the excess of loss on shore over a certain amount, or of any one vessel or of excess of loss in any one locality passed to the reinsurer.

During the year 1917, the home office of the taxpayer paid to foreign insurance companies, for the reinsurance of risks written by the United States branch, the amount of $740,107.11 and recovered $560,563.86 as losses on such contracts of reinsurance. In addition, the United States branch paid directly to the Cotton Insurance Association for reinsurance the amount of $42,275.53, which was charged to and entered on the books of the home office. On this reinsurance recoveries were made in the amount of $10,551.55. The net costs of reinsurance of risks assumed by the United States branch, effected by or on behalf of the home office during the year 1917, was $211,257.23.

During the year 1918 the home office of the taxpayer paid to foreign insurance companies, for reinsurance of risks written by the United States branch, the amount of $846,712.39 and recovered $765,561.05 as losses on such contracts, the excess of the amount paid for reinsurance over recoveries thereon being $81,151.34. The taxpayer included in its gross income for the years 1917 and 1918 the entire amount of premiums received by it on policies written within the United States, and deducted therefrom as an ordinary and necessary business expense the net cost of the reinsurance of the risks covered by such policies effected by the home office.

(4) During the year 1917, there was paid on behalf of the taxpayer by the obligors on so-called tax-free covenant bonds the amount of $186. The Commissioner included said $186 in the taxpayer's income for the year 1917.

(5) The taxpayer's open policy contracts on the cotton business protected the insured, among other things, from loss or damage by reason of exposure to the elements while being loaded on the train or while at the compress. This is commonly known as " country damage." In order to induce the shippers to protect their cotton from " country damage," the taxpayer during the years 1917 and 1918 offered to return to each shipper a portion of the premium representing the difference between the losses paid on country damage and a certain percentage of the total liability covered for him during an entire season. During the years 1917 and 1918, the cotton season, during which the taxpayer's open contracts on the cotton business usually remained in force, was one year, beginning September 1st and ending August 31st. In order to avoid paying a return premium until the taxpayer was certain the insured was entitled to it, the taxpayer provided that the return premium would not be paid until

four months after the insured's last shipment had been made ·for a particular season and until all of the insured's outstanding country damage losses had been settled. As a result of this provision, the taxpayer usually had a liability at the end of the calendar year to return premiums earned by the shippers but not paid. In many instances the amount to be returned was not actually determined, but an estimate was made of what the refund was likely to be and that amount was entered on the taxpayer's books as a liability. The taxpayer's accrued liability under the country-damage provision of its cotton insurance contracts at December 31, 1917, computed as herein set forth, represented an increase of $39,458.55 over the amount accrued as of December 31, 1916; and the amount accrued at December 31, 1918, represented a decrease of $4,765.50 from the amount accrued at December 31, 1917. The amount of $39,458.55 was deducted by the taxpayer from the gross income of the United States branch for the year 1917 and the amount of $4,765.50 was included in the gross income of the United States branch for the year 1918.

(6) The taxpayer is compelled by the Insurance Department of the State of New York to maintain a reserve for unpaid losses and claims. The reserve for unpaid losses and claims maintained by the taxpayer at December 31, 1916, under compulsion of the Insurance Department of the State of New York, was $378,948, and the amount of the same reserve maintained by the taxpayer under compulsion of the Insurance Department of the State of New York at December 31, 1917, was $470,087, the increase in such reserve during the calendar year 1917 being $91,139.

(7) The taxpayer is also compelled by the Insurance Department of the State of New York to maintain a reserve for unearned premiums. The unearned premium reserve so maintained by the taxpayer at December 31, 1916, was $359,494.04, and the amount of the same reserve at December 31, 1917, was $323,222.94, the decrease in such unearned premium reserve during the calendar year 1917 being $36,271.10.

(8) The expenses incurred by the taxpayer's home office during the year 1918 applicable to the United States branch and properly deductible from its gross income for the year 1918, were $33,636.49.

(9) The Commissioner upon audit of the taxpayer's returns for the years 1917 and 1918—

(a) Included in its gross income from sources within the United States, the amounts of $14,373.25 and $23,750, received by it in the years 1917 and 1918, respectively, as interest on the United Kingdom of Great Britain and Ireland bonds and Anglo-French External Loan bonds held in the United States.

(b) Refused to allow as deductions from gross income the net cost of reinsurance effected by the home office, of risks written by the United States branch.

(c) Added to the taxpayer's income for the year 1917, $186 paid on its behalf by obligors of so-called tax-free covenant bonds.

(d) Refused to allow as a deduction from gross income for the year 1917 the amount of $39,458.55, representing the increase of accrued liability in that year on account of the country-damage clause of the taxpayer's insurance contracts, and refused to increase income for the year 1918 by the amount of $4,765.50, representing the decrease in said accrued liability during the year 1918.

(e) Refused to allow as a deduction from gross income for the year 1917 the amount of $91,139, representing the increase in that year of the taxpayer's reserve for unpaid losses and claims.

(f) Increased the taxpayer's income for the year 1917 by $36,-271.10, the amount of the decrease in that year of its unearned premium reserve.

(g) Refused to allow as a deduction from gross income the amount of $33,636.49, representing expenses incurred by the home office of the taxpayer and properly attributable to the United States branch.

Deficiencies in tax in the amounts of $93,532.14 for the year 1917, and $36,262.79 for the year 1918, were determined by the Commissioner.

OPINION.

MARQUETTE: The Commissioner in his answer to the taxpayer's petition herein concedes that the amount of $186 paid on the taxpayer's behalf in the year 1917 by the obligors of tax-free covenant bonds should not be included in the taxpayer's income for that year and that the taxpayer, in computing its net income for the year 1917, is entitled to deduct the amount of $33,639.49 on account of expenses incurred by the home office in that year, which were applicable to the United States branch. Since the hearing, the taxpayer has abandoned its contention that the reserve maintained by it for unpaid losses and claims is a reserve required by law within the meaning of the Revenue Act of 1916, as amended by the Revenue Act of 1917, and that it is entitled to deduct, in computing its net income for the year 1917, the net addition to that reserve made within the year 1917. This leaves for determination four questions which will be discussed in the order in which they are set forth in the findings of fact.

The first question is whether or not there should be included in the taxpayer's income for the years 1917 and 1918 the amounts received by it in those years as interest on certain United Kingdom

of Great Britain and Ireland bonds and Anglo-French External Loan bonds owned by the taxpayer and actually held by it within the United States. It is admitted by the parties to this appeal that the bonds in question were obligations of the Governments of Great Britain and France and that the interest thereon was paid by them.

The Revenue Acts in force during the years 1917 and 1918 respectively were the Revenue Act of 1916, as amended by the Act of October 3, 1917, and the Revenue Act of 1918. Section 10 of the Revenue Act of 1916, as amended by section 1206 of the Act of October 3, 1917, provided —

SEC. 10. (a) That there shall be levied, assessed, collected and paid annually upon the total net income received in the preceding calendar year from all sources by every corporation, joint-stock company or association, or insurance company, organized in the United States, no matter how created or organized, but not including partnerships, a tax of two per centum upon such income; and a like tax shall be levied, assessed, collected, and paid annually upon the total net income received in the preceding calendar year from all sources within the United States by every corporation, joint-stock company or association, or insurance company, organized, authorized, or existing under the laws of any foreign country, including interest on bonds, notes, or other interest-bearing obligations of residents, corporate or otherwise, and including the income derived from dividends on capital stock or from net earnings of resident corporations, joint-stock companies or associations, or insurance companies, whose net income is taxable under this title.

Section 12 of the Revenue Act of 1916 provides in part—

SEC. 12. (a) In the case of a corporation, joint-stock company or association, or insurance company, organized in the United States, such net income shall be ascertained by deducting from the gross amount of its income received within the year from all sources—

*     *     *     *     *     *     *

(b) In the case of a corporation, joint-stock company or association, or insurance company, organized, authorized, or existing under the laws of any foreign country, such net income shall be ascertained by deducting from the gross amount of its income received within the year from all sources within the United States * * *.

The parts of the Revenue Act of 1918 pertinent here are sections 230 and 233, which provide among other things—

SEC. 230. (a) That, in lieu of the taxes imposed by section 10 of the Revenue Act of 1916, as amended by the Revenue Act of 1917, and by section 4 of the Revenue Act of 1917, there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax at the following rates: * * *.

SEC. 233. (a) That in the case of a corporation subject to the tax imposed by section 230 the term "gross income" means the gross income as defined in section 213, except that:

*     *     *     . *     *     *     *

(b) In the case of a foreign corporation gross income includes only the gross income from sources within the United States, including the interest on bonds, notes, or other interest-bearing obligations of residents, corporate or otherwise, dividends from resident corporations, and including all amounts received (although paid under a contract for the sale of goods or otherwise) representing profits on the manufacture and disposition of goods within the United States.

It is apparent from a reading of the foregoing provisions of law that, during the years 1917 and 1918, foreign corporations doing business within the United States were subject to tax only on their net income from sources within the United States, such net income being gross income from sources within the United States, less certain deductions not material here, and it therefore follows that, since the taxpayer is a foreign corporation, the interest received by it in the years 1917 and 1918 on the United Kingdom of Great Britain and Ireland bonds and the Anglo-French External Loan bonds in question should be included in its income only if it was from sources within the United States.

The Commissioner in support of his contention that the interest involved herein was income to the taxpayer within the meaning of the Revenue Acts mentioned relies on the case of *DeGanay* v. *Lederer*, 250 U. S. 376. The facts of that case were that Emily R. DeGanay, a citizen and resident of France, was the owner of certain stocks and bonds of corporations organized under the laws of the United States and of bonds and mortgages secured upon property in the United States, the stocks, bonds and mortgages being actually held in the United States by the Pennsylvania Company for Insurance on Lives and Granting Annuities, as agent for Mrs. DeGanay. The Supreme Court of the United States held that the income from these stocks, bonds and mortgages was subject to tax as income from " property owned * * * in the United States by persons residing elsewhere," under the Revenue Act of 1913, Par. A, subdivision 1, which provided among other things—

That there shall be levied, assessed, collected and paid annually upon the entire net income arising or accruing from all sources in the preceding calendar year to every citizen of the United States, whether residing at home or abroad, and to every person residing in the United States, though not a citizen thereof, a tax of 1 per centum per annum upon such income, except as hereinafter provided; and a like tax shall be assessed, levied, collected, and paid annually upon the entire net income from all property owned and of every business, trade or profession carried on in the United States by persons residing elsewhere.

We have carefully considered the arguments advanced by the Commissioner and the effect of the case of *DeGanay* v. *Lederer*,

*supra*, on the question presented in the instant appeal. We do not agree, however, that the decision in that case is controlling here. Under the Revenue Act of 1913, foreign corporations were taxed on " income accruing from business transacted and capital invested within the United States," and nonresident alien persons were taxed on the income " from all property owned and of every business, trade, or profession carried on in the United States." (Act of October 3, 1913, Pars. G (a), A (1), 38 Stat. 166). It was under the last-quoted provision of the Act that the tax involved in the case of *DeGanay* v. *Lederer* arose. Here we are concerned with taxing statutes that are materially different from the Revenue Act of 1913. Both the Revenue Act of 1916, as amended by the Revenue Act of 1917, and the Revenue Act of 1918 provide that foreign corporations shall be taxed on net income from sources within the United States, such net income being gross income from sources within the United States including " interest on bonds, notes, or other interest-bearing obligations of residents, corporate or otherwise " less certain allowable deductions. It may be noted that while they expressly include in income from sources within the United States, " interest on bonds, notes, or other interest-bearing obligations of residents, corporate or otherwise," they do not in terms include interest from bonds, notes, or other interest-bearing obligations of *nonresidents*. Since interest on bonds, notes, or other interest-bearing obligations of residents, corporate or otherwise, is expressly included in income from sources within the United States, and interest on bonds, notes, or other interest-bearing obligations of nonresidents is not mentioned as being included therein, it may well be held, " *expressio unius est exclusio alterius*," and that Congress intended to exclude interest of the latter class from income from sources within the United States.

But it is not necessary for us, in holding that interest on bonds, notes, or other interest-bearing obligations of *nonresidents* is not income from sources within the United States within the meaning of the Revenue Acts of 1916, 1917, and 1918, to rely entirely on the fact that it is not expressly included by the statutes as being from such sources. The word " sources " as defined by Webster means " first cause; origin; that which gives rise to anything; the first producer; one who or that which originates," and unless the contrary appears, which it does not, it must be presumed to be used in the statute under consideration herein in its ordinary and usual sense, and with the meaning commonly attributable to it. *DeGanay* v. *Lederer*, 250 U. S. 376. What is the source of the income here in question? Concededly it was paid because certain governments foreign to the Gov-

ernment of the United States found it necessary to borrow and did borrow money from persons who were willing to lend, giving to such persons their promise to pay, the promises being in the form of bonds. Pursuant to the tenor of their promises, these foreign governments paid interest. It is apparent that the source of the interest was the foreign government that paid it. We are of the opinion that the interest received by the taxpayer during the years 1917 and 1918 on the bonds referred to herein, was clearly not income from sources within the United States within either the spirit or the letter of the Revenue Act of 1916, as amended by the Act of 1917, or the Revenue Act of 1918.

The second question presented is whether or not the taxpayer, in computing its net income for the years 1917 and 1918, is entitled to deduct the cost of reinsurance effected by the home office of risks written by the United States branch. The taxpayer contends that since it is required to include in its gross income from sources within the United States the entire amount of premiums on risks written by the United States branch, it must, in order correctly to reflect its net income from such sources, deduct the cost of reinsuring such risks. The contention of the Commissioner is in substance that the cost of reinsurance effected by the home office is not deductible, since it would be possible for the taxpayer or any other company engaged in a similar business to reinsure abroad with an affiliated company all of the risks written within the United States, thereby avoiding taxation under the revenue laws of the United States.

The provisions of law pertinent to this issue are section 12 of the Revenue Act of 1916 and section 234 of the Revenue Act of 1918, which were in effect during the years 1917 and 1918, respectively. Section 12 of the Revenue Act of 1916 provides in part that—

(b) In the case of a corporation, joint stock company or association, or insurance company, organized, authorized, or existing under the laws of any foreign country, such net income shall be ascertained by deducting from the gross amount of its income received within the United States—

First. All the ordinary and necessary expenses actually paid within the year out of earnings in the maintenance and operation of its business and property within the United States * * *.

Section 234 of the Revenue Act of 1918 provides among other things as follows:

(a) That in computing the net income of a corporation subject to the tax [including foreign corporations] imposed by section 230 there shall be allowed as deductions:

(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.

*        *        *        *        *        *        *

(14) * * * (b) In the case of a foreign corporation the deductions allowed in subdivision (a), except those allowed in paragraph (2) and in clauses (a), (b), and (c) of paragraph (3), shall be allowed only if and to the extent that they are connected with income arising from sources within the United States * * *.

From the above-quoted sections of the Revenue Acts, it is apparent that the taxpayer, being a foreign corporation, is entitled to deduct from gross income from sources within the United States, among other things, all ordinary and necessary expenses paid during the year 1917 "in the maintenance and operation of its business and property within the United States" and all necessary and ordinary expenses. paid in carrying on its business during the year 1918, to the extent that the expenses are "connected with income arising from sources within the United States."

The taxpayer claims the right to deduct from its gross income from sources within the United States, the "net cost" of all reinsurance effected by the home office during the years 1917 and 1918 of risks written by the United States branch. This "net cost" represents the excess of the amount paid for reinsurance over recoveries thereon. The effect is the same as if the taxpayer had included in its gross income from sources within the United States all recoveries made on the reinsurance of risks written by the United States branch and deducted the entire cost of the reinsurance. We are of the opinion that this is a proper method of determining the net income of the taxpayer's United States branch and that it could not be correctly determined by any other method. The taxpayer is required to include in gross income from sources within the United States the entire amount of premiums on risks written therein. From this gross income it is obviously entitled to deduct losses on the risks written, and the expense of doing business. If a loss is sustained on any risk, the actual loss of the taxpayer thereon is the entire amount of the loss compensable under the original policy less the amount recovered by the taxpayer on the reinsurance of that policy. It reduces its deductible losses by the amount of recoveries on reinsurance, or, in other words, it, in effect, includes in gross income from sources within the United States the total amount recovered on the reinsurance of risks written in the United States, and it clearly should be entitled to deduct from gross income the cost to it of the amount so recovered. In this connection it may be pointed out that the amount of recoveries on reinsurance in any year might exceed the cost of such reinsurance.

It is not necessary to enter into an extended discussion of the methods by which the business of marine insurance is carried on.

It is sufficient to state that the evidence establishes that reinsurance of risks is a vital phase of the business and that it is necessary that marine insurance companies reinsure a portion of their risks in order to spread their liability and minimize their losses. Otherwise it would be difficult or perhaps impossible for them to continue in business. Since reinsurance is a vital and necessary phase of the marine insurance business, the cost of such reinsurance must be regarded as an ordinary and necessary expense of that business. The taxpayer during the years 1917 and 1918 wrote certain risks within the United States, and a portion of these risks was reinsured either directly by the United States branch with companies doing business in the United States, or by the home office under its blanket reinsurance contracts with other foreign companies. The Commissioner has permitted the taxpayer to deduct as a business expense the net cost of reinsurance effected directly by the United States branch with companies doing business in the United States, but has refused to permit the deduction of the cost of the reinsurance effected by the home office of risks written by the United States branch. We can perceive no distinction between the reinsurance effected by the home office for the United States branch and the reinsurance effected directly by the United States branch. In each case the taxpayer was simply purchasing insurance in order to protect itself against the possibility of too great a loss on the risks written by the United States branch. We are of the opinion that the cost of the reinsurance in question was an ordinary and necessary expense in the maintenance and operation of the taxpayer's business in the United States and that it is connected with income arising from sources within the United States.

The third question is whether or not the taxpayer in computing its net income for the year 1917 is entitled to deduct the increase in its accrued liability as at the end of that year on account of the country-damage clause in its cotton contracts and to increase its income for the year 1918 by the amount of the decrease of the same liability as of the end of that year. The evidence relative to this question establishes that the taxpayer, in order to induce shippers to protect their cotton against loss resulting from exposure, offered to return to them a portion of the premium paid, representing the difference between the losses paid on country damages and a certain percentage of the total liability covered during the entire season, payment of the return premium not to be made until four months after the insured's last shipment and until after all of the outstanding country damage losses had been settled. As a result of this provision, the taxpayer usually had a liability at the end of the

calendar year to return premiums earned by the shippers. These amounts appear to have been estimated and set up on the taxpayer's books at the close of the year. The increase during the year 1917 of the liabilities so set up was deducted from gross income for that year. During the year 1918 this liability decreased by $4,765.50 and that amount was added to the taxpayer's income for that year.

We are of the opinion that the amount of payments made or incurred by the taxpayer in any year on account of the liability to return, under the country-damage clause of cotton insurance contracts, a portion of its premiums to the insured, is a proper deduction from gross income for that year. However, the evidence fails to show that the items involved herein represented liabilities either paid or actually incurred. On the other hand, the account in question appears to have been a mere estimate, an undetermined liability in the nature of a reserve, and we are of the opinion that the Commissioner's action in respect thereto should be approved.

The fourth question presented for determination is whether or not the decrease in the taxpayer's unearned premium reserve during the year 1917 constituted income to it for that year. The Commissioner added the amount of the decrease to the taxpayer's income on the ground, as alleged in his answer herein, that the decrease resulted in an increase of the same amount in the taxpayer's free assets. The Commissioner in his answer also denied that the reserve for unearned premiums is a reserve required by law within the meaning of the Revenue Act of 1916 which provides—

Sec. 12. (b) In the case of a corporation, joint-stock company or association, or insurance company, organized, authorized, or existing under the laws of any foreign country, such net income shall be ascertained by deducting from the gross amount of its income received within the year from all sources within the United States—

First. All the ordinary and necessary expenses actually paid within the year out of earnings in the maintenance and operation of its business and property within the United States, including rentals or other payments required to be made as a condition to the continued use or possession of property to which the corporation has not taken or is not taking title, or in which it has no equity.

Second. * * * (c) In the case of insurance companies, the net addition, if any, required by law to be made within the year to reserve funds and the sums other than dividends paid within the year on policy and annuity contracts * * * .

A similar provision relative to reserves which insurance companies are required by law to maintain is found in the Revenue Act of 1913.

50144°—27——58

The reserves for unearned premiums maintained by insurance companies are reserves known to the general law of insurance and are usually required by the laws of the several States regulating the insurance business. The reserve under consideration here was specifically required by the laws of the State of New York and by regulations promulgated thereunder. That reserves of this character are required by law within the meaning of the Revenue Acts of 1913 and 1916 is clear and seems to have been so recognized by the courts, although the question, so far as we can find, has never been directly raised. *McCoach* v. *Insurance Co. of North America*, 244 U. S. 585; *Maryland Casualty Co.* v. *United States*, 251 U. S. 342. We are of the opinion that the reserve for unearned premiums maintained by the taxpayer was a reserve required by law within the meaning of the Revenue Act of 1916.

The facts as to the decrease in the year 1917 in the taxpayer's reserve for unearned premiums are disclosed by the pleadings, but no evidence thereof was presented by either party to this appeal. The taxpayer alleged that the amount of the decrease did not go into the free assets of the company but was used to pay policy losses. The Commissioner alleged that the decrease in the reserve resulted in an increase of the same amount in the taxpayer's free assets, and that it therefore constituted income to the taxpayer.

The rules of this Board provide that the burden of proof is on the taxpayer. This means that unless the Commissioner in his answer admits the material allegations of the taxpayer's petition, the taxpayer must produce sufficient evidence to make a *prima facie* showing that the allegations of the petition are true and to overcome the proof submitted by the Commissioner. As to the issue here presented, the Commissioner has determined that the decrease in the taxpayer's unearned premium reserve resulted in an increase of its free assets and therefore constituted income. The taxpayer alleged in its petition that the decrease in the reserve did not result in an increase of its free assets, and the Commissioner denied that allegation. The issue has been squarely joined, the burden of proof being placed thereby on the taxpayer to establish its contention by evidence. It has failed to produce any evidence in support of its contention as to this point and, in the absence of such evidence, we must approve the determination of the Commissioner. *Appeal of J. M. Lyon*, 1 B. T. A. 378.

The taxpayer in its petition alleges that a computation of its income or loss from sources within the United States for the year 1919, on the basis which we have herein set forth for computing its

income for the years 1917 and 1918, results in a net loss which it is entitled to apply against its net income for the year 1918. However, no evidence was introduced by the taxpayer to support this contention.

> *Order of redetermination will be entered on 10 days' notice, under Rule 50.*